SARAH KENNEDY, ADMINISTRATRIX, DEFENDANT IN ERROR, v. NETHERLANDS AMERICAN STEAM NAVIGATION COMPANY, PLAINTIFF IN ERROR.

Argued June 30, 1908—Decided March 16, 1909.

1. In an action to recover for the wrongful death of a deceased the plaintiff must do more than show the possible responsibility of the defendant therefor.  In the absence of direct evidence the law requires that the existence of such circumstances must be shown as will justify the inference that the death resulted from the neglect of a duty which the defendant owed to the decedent, and exclude the idea that it was due to a cause for which the defendant was not responsible.
2. No liability rests upon the master for the death of a servant when caused solely by the negligence of a fellow-servant.
3. When the death of a servant results from an accident which has been caused to some extent by his own negligence, the master is not responsible even though his negligence also has been a contributing cause to the accident.

---

On error to the Supreme Court.

For the plaintiff in error, *Gilbert, Collins* and *George S. Hobart.*

For the defendant in error, *Warren Dixon.*

The opinion of the court was delivered by

GUMMERE, CHIEF JUSTICE. This action was brought to recover damages for the death of plaintiff's intestate, John Kennedy, which occurred while he was in the employ of the defendant company as a coal shoveler. The work in which he was engaged was trimming coal on the defendant's steamer "Staatendam," on what is known as the "between decks," while the steamer was at the Hoboken docks. In order to get to this part of the vessel it was necessary to climb down a ladder from the main, or upper, deck, to the next deck below known as the spar deck, and thence down another ladder to the "between decks" where the coal bunkers were located. Below the "between decks" was the hold. There were two hatchways opening into the hold from the "between decks." These hatchways were opposite one another, with a space of about two feet between them. The ladder leading from the "between decks" to the spar deck was located about three or four feet from the forward starboard corner of the starboard hatchway. Directly over the hatchways in the "between decks" was a large hatchway in the spar deck, and directly above this last-mentioned hatchway was another hatchway of the same size on the main, or upper, deck. In front of the coal bunkers where Kennedy, together with other employes, was working, was a movable bulkhead separating them from the rest of the "between decks." This bulkhead was about twenty feet distant from the hatchways on the "between decks." There was an opening in it some two or three feet square through which the coal trimmers passed into the bunkers. The "between decks" received what light it had through the hatchways which were in the main and spar decks, and which were left uncovered while the vessel was being loaded or unloaded, the sun being depended upon to furnish the light through the day, and a cluster of electric lamps, which was suspended over the middle of the hatchway upon the main deck, furnishing the light at night. The bulkhead which separated the coal bunkers from the rest of the "between decks" shut off from the bunkers the light which came through these hatchways, and the coal trimmers were

supplied with light by lamps which were furnished to them by the defendant company, and which were extinguished and left in the bunkers when they stopped work. On Saturday, the 17th of October, 1903, Kennedy and his co-laborers began work in the bunkers at seven o'clock in the morning; they worked until twelve o'clock, and then went out for lunch, returning at one. At six o'clock they quit work for the day, and the men, with the exception of Kennedy, left the bunkers one after another, passing through the opening to the "between decks," and from thence up the ladders to the main deck. At that time the electric lights were burning, but the upper hatchway had been partially closed by someone to keep out the rain which had fallen during the afternoon, thereby partly intercepting the light which would otherwise have been thrown upon the "between decks." Apparently to make up for this deficiency in the light, a candle had been placed upon the floor of the "between decks." After the men had come up, one Peterson, an employe of the company, who was on the main deck, called down through the hatchways to see if any of the coal shovelers remained below, and, receiving no answer, went down to the "between decks" and extinguished the candle, and then returned to the main deck and put the covers over the main hatchway. On Monday morning following the dead body of Kennedy was discovered in the hold. No one saw the accident which produced his death—in fact, he was not seen by anyone after he stopped work in the coal bunkers on Saturday night. He had worked in these bunkers on at least a half dozen other occasions when the vessel was in port.

On the facts recited the trial court left it to the jury to say whether Kennedy's death occurred while coming away from the coal bunkers with his companions, and, if so, whether it was due to his accidentally falling into the hold through inability to see his way for want of sufficient light on the "between decks," and charged them that, in case they so found, they should determine whether, in not providing more light at that place and time, the defendant had failed in the duty to use reasonable care to see that the way furnished to Ken-

nedy when leaving his work on the occasion of his death was reasonably safe, and further, that if they found such failure of duty on the part of the defendant, their verdict should be for the plaintiff. Under these instructions the jury returned a verdict for the plaintiff, and this writ of error brings up for review the judgment entered thereon.

The principal ground upon which the judgment is attacked before us is that the trial court erred in permitting the case to go to the jury at all; that the motion to nonsuit the plaintiff, made at the close of her case, should have been granted, and further, that the motion to direct a verdict for the defendant, made when all the proofs were in, was improperly refused. These motions were, each of them, based on three grounds—*first,* that the danger of falling through the open hatchway into the hold while passing to and from his work, was a risk assumed by Kennedy; *second,* that the proofs conclusively showed that the deceased contributed to the accident by his own negligence; and *third,* that there was no proof of negligence on the part of the defendant.

The facts in this case will not, in our judgment, support a finding that the defendant failed in its duty to provide sufficient light to enable the deceased to safely make his way from the coal bunkers to the main deck. The "between decks," as we have already said, was usually lighted by leaving the covers off the main and spar deck hatchways, thus permitting the sunlight to penetrate to that point during the day, and the light from the cluster of electric lamps which were kept burning at night over the main hatchway to illuminate this space after dark. That this method of lighting that part of the vessel was sufficient to enable employes who were engaged at work in the coal bunkers to go to and from their work in safety, is not controverted on the part of the plaintiff; but it is contended that, as the proofs showed that on the occasion when the plaintiff's decedent came to his death, the usual conditions did not exist, that the main hatchway had been partly covered, and that the light which would otherwise have shone down upon the "between decks" was thereby, to a considerable extent, excluded; the defendant was charge-

able in law with this condition of affairs, and was, consequently, neglectful of the duty which it owed to the decedent of using care to see that he was afforded a safe egress from his place of work. This contention we think fallacious, and the fallacy lies in the assumption that the defendant was responsible for the covered condition of the main hatchway at the time the decedent stopped work on Saturday evening. A principal feature of the system adopted by the defendant for lighting the "between decks" was to keep the main hatchway uncovered, and this system, as has been stated, was adequate for the protection of the workers in the coal bunkers. The temporary interference with the passage of light to the "between decks" by the partial covering of the upper hatchway was not shown to have been done by the direction of the defendant company, or of any one who represented it, nor was it shown that the company was chargeable with notice of it. So far as the proofs disclose it is as probable that it was done by a fellow-servant of the decedent acting upon his own responsibility, as that it was done by the instruction of the master or with his knowledge. If it was the act of a fellow-servant, then under all our cases the master is not responsible for such negligent act, and incurs no liability by reason of it. *Sofield* v. *Guggenheim Smelting Co.,* 35 *Vroom* 605, and cases cited. In order to support her contention that the death of her decedent was due to a failure on the part of the defendant company of a duty which it owed to him as his employer, the burden rested upon her to do more than show the possible responsibility of the defendant therefor. In the absence of direct evidence the law requires that she must show the existence of such circumstances as would justify the inference that his death resulted from a neglect of duty by his employer and exclude the idea that it was due to a cause for which the company was not responsible. *Suburban Electric Co.* v. *Nugent,* 29 *Id.* 658. This burden she has not sustained.

But even if the proofs had been sufficient to justify the conclusion that the partial covering of the upper hatchway was the act of the defendant company and not that of a fellow-servant of the deceased, done without authority from

the master, there would still seem to be an insuperable obstacle in the way of the plaintiff's recovery. If it be assumed that the partial shutting off of the light through the hatchway was in accordance with the instructions of the master, it should also be assumed that the substitution of the candle, upon the floor of the "between decks," for that light was also done by its order. That this candle furnished sufficient light for the safe egress of the coal shovelers from the bunkers to the ladder leading to the spar deck is shown by the fact that all of decedent's fellow-workers found it so. Whether Kennedy left the coal bunkers with his fellow-workmen, or remained behind, is not shown by the proofs. The natural conclusion to be drawn from all the facts, we think, is that, for some undisclosed reason, the deceased delayed leaving the bunkers until after the candle had been removed, and the main deck hatchway entirely closed, and then found the "between decks" too dark to be crossed with safety. The act of extinguishing the candle and closing the hatchway by Peterson after calling down for the purpose of ascertaining whether the coal shovelers were all out, and receiving no reply, was the act of a fellow-servant of deceased, done apparently upon his own responsibility. If it was negligent of him to extinguish the light and close the hatchway without taking more care to discover whether the decedent was still in the bunkers, that negligence affords no ground for imposing liability upon the defendant.

The motion to direct a nonsuit and also the motion to direct a verdict for lack of proof of negligence on the part of the defendant, should, each of them, have prevailed.

The contention made by the defendant that the deceased came to his death through his own negligence is also, we think, well founded on the proofs. If, when he fell into the open hatchway, the "between decks" was sufficiently lighted for him to have seen and avoided it, it seems too plain for argument that his fall must have been due to his carelessness in not observing and keeping clear of the hatchway; for his work in this same place on other occasions when the vessel was in port must have made him familiar with its location

and construction, and the only care necessary to avoid it was such ordinary care as those who work on shipboard are expected to exercise. If, on the other hand, when he left the coal bunker the "between decks" was so dark that he could not see where he was going, reasonable prudence required him to take proper precautions to avoid the danger of falling into the hatchway. If he left the bunkers with his fellow coal shovelers, and his eyesight was defective and prevented him from seeing with sufficient clearness to avoid it, the natural and prudent course was to call upon some one of them, who was able to observe the surroundings, to assist him in getting to the ladder. If, for any cause, he was required to remain in the bunkers until after his fellows had gone, he should have made some provision against being left in complete darkness (as was the condition after Peterson had extinguished the candle and closed the main hatchway) either by notifying one of his co-laborers that he was staying behind, and requesting him to advise those in charge of the fact, or by taking some other precaution against it. Failing in this he could have readily returned to the bunkers for his lamp when he found the "between decks" too dark to be crossed in safety. The fact that he fell into the hatchway, when the observance of such ordinary precautions as we have suggested, or of others which are equally obvious, would have afforded him ample protection against the danger of doing so, fully justifies the conclusion that the accident which produced his death was largely the result of his own careless conduct.

The judgment under review will be reversed.

*For affirmance*—None.

*For reversal*—THE CHIEF JUSTICE, GARRISON, SWAYZE, REED, TRENCHARD, BERGEN, VOORHEES, MINTURN, BOGERT, VREDENBURGH, GREEN, DILL, J.J.   12.